Wright v. Hart.

---

### Wright vs. Hart and others.

In a *general sale* of merchandise for a *sound price*, where there is no *express warranty* or *fraud*, an action will not lie against the vendor on an *implied warranty* that the article is *merchantable*, although it be not fit for all the purposes to which it is ordinarily applied: *so held*, where the article sold was *flour*, made of *grown wheat*, which rendered it *unfit* for *ordinary bread* and unprofitable made into *starch.(a)*

The English cases on the subject of *implied warranties* adverted to and commented upon.

Error from the supreme court. Wright sued the defendants in error, in the superior court of the city of New-York, for breach of warranty in the sale of 315 barrels of flour. The declaration contained several counts, alleging that the flour was sold as good, sound, wholesome, merchantable, and of the first quality, and averring that it was not good, and that it was unsound, unwholesome, damaged, unmerchantable, and of inferior quality. The defendants pleaded *non assumpsit*. The flour was sold in November, 1833, at $5.81¼ per barrel, being described in the sale note as "E. S. B. flour;" (meaning E. S. Beach's flour.) The plaintiff was a *manufacturer of starch*. The defendants were *commission merchants*, and sold flour received by them from E. S. Beach, the manufacturer. The plaintiff [450] did not disclose, at the time of the purchase, the use to which he intended to apply the flour. After its delivery, he found on trial it had been manufactured of *grown wheat*, and offered to return it to the defendants, who refused to accept

---

(a) The Chancellor and *Senator* Tracy fully accord with *Justice* Cowen, in the opinion delivered by him in this case when in the supreme court, insisting upon a strict adherence to the common law rule of *caveat emptor*. *Senator* Tracy goes one step further, and holds, that even in the sale of the article of *food* there is no *implied warranty* of *wholesomeness*, and that the only remedy of the purchaser in such case, is by *action on the case* for a fraudulent sale. From this opinion *Senator* Maison dissents.

Wright *v.* Hart.

it. Good bread for ordinary use cannot be made of such flour—it is unwholesome; it is fit, however, for making hard bread and biscuit crackers; and for some purposes said to be superior to any other flour, but it is not profitable for making into *starch*, it yielding on an average 25 lbs. per barrel *less* starch than good flour, and requiring 50 cents per barrel more labor in manufacturing it into starch than flour made of wheat not grown. The value of grown flour in market was, at the time of the sale, from $12\frac{1}{2}$ to $18\frac{3}{4}$ cents *less* per barrel than flour not grown. The plaintiff paid the highest market price for the best flour. The flour in question was as fair to appearance as the best flour, and could not be known to be made of grown wheat by mere inspection. The judge who presided at the trial instructed the jury, that if the flour in question was *defective and unfit for the ordinary purposes for which flour is used,* the plaintiff was entitled to recover. The defendant's counsel excepted to the charge. The jury found a verdict for the plaintiff for $450, on which judgment was entered. The defendants sued out a writ of error. The judgment of the superior court was *reversed* in the supreme court, (17 *Wendell,* 267.) Whereupon the plaintiff sued out a writ of error, removing the record into this court.

The cause was argued here by

*D. Graham,* for plaintiff in error.

*M. T. Reynolds,* for defendant in error.

*Points insisted on by counsel for plaintiff in error :*

I. There was an *implied warranty* that the flour should be *merchantable*, or which is the same thing, that it should be, in the language of the judge who tried the cause, " fit for the ordinary purposes for which flour is sold." 1. The [451] flour not only bore the best brand in the market, but the plaintiff in error had frequently purchased of that brand from the defendants in error, and had proved it. Coming from the same house, under the same brand, without notice, there was an implied assurance that it was of the same description of flour as formerly purchased and used by the plaintiff. 2. If there was not an implied warranty that the flour was of any particular fineness of quality, which it is not necessary to contend for, it was at least implied that the flour was fit for some of the ordinary purposes for which flour is sold. 3. The judge, at the trial, in directing the attention of the jury to the question, whether the flour was "fit for the ordinary purposes for which flour is sold," introduced no new principle. It was, in fact, asking the jury to say whether the flour was for any purpose merchantable or saleable. 4. The principles contained in recent decisions in our courts, and applied to sales of packed cotton, are particularly applicable in this case, raising an implied warranty that the article shall throughout correspond with what it appears. If its appearance indicates a merchantable article, it will be a warranty against any latent defect that may render it unmerchantable.

II. The evidence abundantly shows that the flour was unfit for the ordinary purposes for which flour is sold, or for any merchantable purpose. It would neither make starch nor bread, nor was it wholesome in any form of food.

III. The unwholesomeness of the flour was made a point at the trial, and was insisted on in the proof and urged to the jury, and the jury by their verdict responded to it along with the other defects, inasmuch as they found that the flour was not fit for any of the ordinary purposes for which flour is sold.

IV. There was no opportunity for inspection; it was delivered from the boat; and if there had been, the proof shows that the latent defect in flour made of grown wheat, is that kind that it cannot be discovered on inspection. It is therefore clearly not a case within the ordinary rule of an opportunity to inspect, or of the fact of inspection of the article sold.

[452] V. The defendants in error, not having disclosed their principal at the time of the sale, were properly held as the principals, in awarding damages to the plaintiff in error.

VI. Nor could it exonerate the defendants in error from their liability, even

Wright *v.* Hart.

viewed in the light of agents, to have credited their principal in an open unliquidated account current. That is not such a payment over by the agent to the principal as will protect him on notice of the defect of the article. It is equivalent to a notice not to pay over while the money is still in his hands.

*Points insisted on by counsel for defendants in error:*

I. There was no warranty and no fraud on the sale of the flour.

II. No implied warranty arises from the price which was to be paid. (2 *Kaines,* 48 ; 20 *Johns. R.* 196 ; 4 *id.* 41.)

III. The flour was not sold for any particular purpose, and therefore there was no implied warranty that it was fit for any particular purpose. It was a general sale.

IV. The declaration contained no count on any sale for any particular purpose ; and certainly none on any warranty that it was "fit for the ordinary purposes for which flour was used." No action lies merely because the flour was not fit for the usual, common or ordinary purposes for which it is used, unless it is sold for some such usual or ordinary purpose, and then it is admitted there is a warranty of its fitness for the purpose for which it is sold. In such a case it is a part of the contract. (1 *Johns. R.* 96, 129 ; 3 *Wendell,* 102 ; 1 *id.* 189 ; 2 *East,* 314; 5 *Bing.* 540 ; 4 *Barn & Cres.* 108 ; 10 *Mass. R.* 97 ; 12 *Johns. R.* 468 ; 2 *Kent's Comm.* 478, 2d ed.)

V. The judge, therefore, erroneously charged the jury that if the flour was not "fit for the ordinary purposes for which flour is used," the plaintiff had a right to recover.

After advisement, the following opinions were delivered :

By the CHANCELLOR. In the case of *Waring* v. *Mason,* decided by this court at the present term, *ante, p.* 425, I had occasion to refer to the difference between the common law and the civil law, in relation to implied warranties [453] upon sales of personal property. It is only necessary, therefore, that I should refer to the rules of both, as there stated, so far as they have a bearing upon the question under consideration in this case. The rule of the civil law is *caveat venditor,* and therefore, if the seller wishes to secure himself from future responsibility, in case the article sold should afterwards be found to be different in kind or quality from what the parties supposed it to be, he must *take care* or *provide against* such a responsibility, by a particular agreement with the purchaser. (*Poth. on Cont. de Vente, art.* 7, § 1, *No.* 182 ; *Code Nap. art.* 1641, 1643.) The rule of the common law, on the contrary, is *caveat emptor,* which implies that the purchaser must *take care* to examine and ascertain the kind or quality of the article he is purchasing, or *provide against* any loss he may sustain from his ignorance of the kind or quality of the article sold, or from his inability to examine it fully, by an express agreement of warranty, that the article purchased is of the particular kind or quality which the parties supposed it to be. It will be seen, therefore, that the principal difference between the rules of the civil law and the common law is as to the party upon whom the responsibility is thrown of securing himself, either by a full examination of the article, or by an express stipulation against future liability or loss ; and it is not so material which way the law is established, as that the rule should be uniform, and perfectly understood, so that both buyer and seller may know with certainty what the law is, and each be enabled to protect his own rights by the form of the contract.

Some few exceptions or departures from each of these rules have been found necessary for the interest of trade. In *Scotland,* where the civil law prevails, the *actio quanti minoris* to recover for a trifling deficiency in quantity, without rescinding the contract, and the *actio estimatoriæ* to recover for a small diminution in the quality and value of the article delivered, are both disallowed. The exceptions, if any, to the English or common law rule are, that upon a sale by a *manufacturer* of articles of his own manufacture, which are [454] ordered for particular use, there is an implied warranty that they are fit

Wright v. Hart.

for the use for which they are ordered; or upon a sale of *provisions* for domestic use, that they are not unwholesome, so as to be deleterious to health; or upon goods of a particular kind or quality being ordered, and where the purchaser has no opportunity to inspect for himself, that there is an implied warranty that the goods are of that kind or description.    Some of the judges in recent English cases have gone this length, and much farther; they have attempted to establish the doctrine, that upon a general sale, there is an implied warranty that the article is merchantable, or fit for some purpose; but, as Chancellor Kent observes, this is not the common law of England or of this state.    Indeed, if the article was of no value whatever to either party at the time of the sale, it might perhaps form a good defence to an action for the price—not upon the ground, however, of an implied warranty that the article was merchantable, but that the consideration of the promise to pay had entirely failed.

In this case, the judge who tried the cause carried the principle of implied warranty much farther than it is carried in any of the recent English cases which are repudiated by Chancellor Kent.    It was a general sale of E. S. B. flour; that is, of E. S. Beach's brand, without specifying any particular quality or goodness, or the particular use or object for which it was intended.    The flour unquestionably answered that description; and it was *merchantable*, according to Ch. J. Best's definition of the term, for it was fit for *some purposes.*    Indeed, it was worth nearly as much as the best flour of that brand; although, being made of wheat a little grown or sprouted, it would not make *starch*, and was not as good for loaf bread as if the wheat had not been grown.    The jury were instructed that if the flour was defective, and not fit for the *ordinary purposes* for which flour was used, the plaintiff was entitled to recover as upon an implied warranty.    Whether the judge meant the jury to understand that the flour must be fit for *all the ordinary purposes* for which flour is used, in order to excuse the defendants from liability, and render it merchantable, it is difficult to [455] determine, as the testimony showed that for some purposes for which flour is ordinarily used, to wit, the making of paste for paper-hangers, it was better than if the wheat had not been grown; and that it was not injured for the purposes of making hard or ship bread.    Judge *Cowen*, who delivered the opinion of the supreme court, has so elaborately reviewed all the cases on this subject, that it is needless to follow him.    It is only necessary to say, that I perfectly concur with him that there was no warranty, either express or implied, in this case according to the settled law of this state.    The judgment of the supreme court, reversing that of the superior court of New-York, should therefore be affirmed.

By Senator MAISON.    The general rule is well understood, that in the sale of any article of merchandise, a warranty cannot be implied of the goodness of the article, from the fact that a sound fair price has been paid, or agreed to be paid; and that redress cannot be had, although the article sold is not a saleable, merchantable article, unless there be a warranty of its soundness or quality, or unless the vendor has been guilty of fraud in the sale.    In such sales the purchaser can always protect himself by demanding a warranty; if that be not required, and there be no fraud on the part of the vendor, the purchaser buys at his own risk; his judgment is his only warrantor, and he has no right to call on the vendor for any damages he may have sustained, by the article being different or of an inferior quality from that which he expected he was purchasing.    The maxim of *caveat emptor* applies. (2 *Black. Comm.* 451.    *Chancellor* v. *Lopes, Cro. Jac.* 4.    *Seixas* v. *Wood,* 2 *Caines,* 48.    *Holden* v. *Dakin,* 4 *Johns. R.* 421.    *Sweet* v. *Colgate,* 20 *id.,* 196.    *Snell* v. *Moses, id.* 196.    *Perry* v. *Aaron, id.* 129.    *Welsh* v. *Carter,* 1 *Wendell,* 185.    *Conner* v. *Henderson,* 15 *Mass. R.* 319.)

There are, however some exceptions to this rule—cases where the law will imply a warranty, thus: If an article is sold by sample, the law, in the furtherance of fair and honest dealing, and in accordance with the general understanding, implies a warranty that the bulk shall compare with the sample; [456]

Wright *v.* Hart.

if this were not so, there would be no use nor object in selling by sample. (*Beebe* v. *Robert*, 12 *Wendell*, 413. *Gallagher* v. *Waring*, 9 *id.*, 20. *Waring* v. *Mason, decided this term.*) So the law will imply a warranty where there has been no opportunity to inspect the commodity before sale. Lord Ellenborough, in *Gardiner* v. *Gray*, (4 *Campb.* 144,) lays down the rule, and I am not aware of any decision contradicting it, that " when there is no opportunity to inspect the commodity, the maxim of *caveat emptor* does not apply. He cannot, without a warranty, insist that it shall be of a particular quality or fineness, but the intention of both parties must be taken to be, that it shall be saleable in the market under the denomination mentioned in the contract between them. The purchaser cannot be supposed to buy goods to lay them on a dunghill." See also 2 *Kent's Comm.* 479, 2d ed.

The law in relation to the sale of provisions stands upon an entirely different footing ; there, out of regard to the health and lives of men, the law always implies the article sold to be sound and wholesome, and fit for food. (3 *Black Comm.* 166. *Van Bracklin* v. *Fonda*, 12 *Johns. R.* 468.) This implied warranty must prevail in all cases in the sale of provisions; the party having an opportunity to examine the article, does not exempt the vendor from liability, unless the defect in the article be so palpable that the most unskilful and inexperienced, can from examination or from inspection, easily detect it, or the purchaser at the time be informed of the defect, or the vendor informed that the article is wanted for other purposes than for food for man. This is a sound and salutary principle, and should be enforced with the most unyielding firmness. I am aware of but one decision in contravention of this principle, and that is in the case of *Emerson* v. *Brigham*, (10 *Mass. R.* 197) where Mr. Justice Sewall held that " there was nothing to be inferred, in the sale of *provisions*, which may not be inferred to a like purpose in other cases, where the calling or profession of the seller, the soundness of the price, and the nature of the article sold, have been made [457] the grounds of decision." I cannot subscribe to the doctrine of that case. Such has not been considered the law of this state, and I am unwilling to contribute to its introduction here.

How far have these rules, or any of them, a bearing or application to the facts of the case now under consideration? The plaintiff was a manufacturer of starch, and the defendants knew it; he had, some half dozen times before the purchase in question, purchased flour of them, and used it in making starch ; but there is no proof that the plaintiff purchased this flour for that purpose. Indeed, one of the witnesses expressly testifies, and he is not contradicted, that when the plaintiff purchased, he did not state for what purpose he purchased the flour, or the use he intended to make of it; and even if he had made the purchase for that object, it does not appear that the defendants knew it to be unsound or unfit for that purpose, and there is no pretence that the defendants expressly warranted the flour as good for that purpose. The main and important question to be decided in this case is, whether, upon the sale of this flour, *being an article of provisions*, the law does not imply a warranty of its being good, sound, wholesome and merchantable? This question is susceptible of a ready answer, if the law be as before stated. The proof is abundant that the flour was not good, sound or wholesome, and by necessary consequence, it was not merchantable. It is proved not to be good, sound, and wholesome for the making of bread ; and although some of the witnesses are of opinion that it was good to make hard bread, biscuit, crackers and pilot bread, yet others do not hesitate in saying it is not good or wholesome even for those purposes ; and that if they knew flour to be made of grown wheat, as the flour in controversy was, they would not purchase it at all : they do not consider it a merchantable article. These were facts fit and proper to be passed upon by the jury, and they have found that this article was not good, wholesome or merchantable.

Exception, however, is taken to the charge of the judge in this, that he

[458] charged the jury " that the defendants were liable to the plaintiff for damages, if the flour in question in this case was defective and unfit for the ordinary purposes for which flour is used." It appears to me that this charge is perfectly unexceptionable, and that the jury could in no manner have been misled thereby. What are the ordinary purposes for which flour is used? no one can hesitate to answer that its ordinary use is the making of bread, biscuit, cake, and that it is otherwise in a great variety of ways used and worked up for food. This would be the answer given ordinarily without the labor of a moment's reflection. These are the great primary and ordinary purposes for which flour is used, and so the law intends. There are, it is admitted, other uses to which it can be applied ; but if purchased for any other use, and the vendor be informed thereof, then, although the article may not be good for food, the law will not imply a warranty of its being good and wholesome for food, for the purpose of enabling the purchaser to recover under that warranty damages, because of the unsoundness or insufficiency of the article for the declared purposes for which it is purchased. *See Gray* v. *Cox*, before cited. I do not understand the law to be, that in the sale of any article other than that which is used for food, a warranty will be implied that the article sold is even a saleable merchantable article, or fit for some use, if the purchaser has had an opportunity of inspecting it. There can be no such implication in such cases, and the party must be remediless unless he protects himself by a warranty, or the vendor has been guilty of fraud in the sale. I am satisfied the jury were not misled or misdirected by the judge ; that the verdict is substantially just, and the judgment thereon should be enforced. The judgment of the supreme court reversing that judgement, should therefore be reversed, with costs.

By Senator TRACY. In voting, as I shall, to affirm the judgment of the supreme court in this case, I feel that it is not possible to add much, and perhaps not necessary to add any thing, to the luminous and learned opinion which that court has given in support of its judgment. But as the case has been [459] urged upon this court in one view more strongly, probably, than it was upon the supreme court, I feel disposed to express my opinion upon it rather more distinctly than that court has seen occasion to do.

I have been accustomed to suppose that the rules as to the liability of vendors, on sales of personal property, were clearly defined and firmly settled, at least in this state ; but I am getting to learn that the spirit of the age, which is disposed to consider nothing settled that it imagines susceptible of improvement—a spirit which regards nothing as too ancient to be attacked—nothing as too new to be attempted, is extending its influences to the oldest and deepest rooted principles of the common law. This event might not be so much regretted, if it were proposed to be brought about only through the open and responsible agency of legislation ; but when pursued through the devious and occult process of judicial exceptions and qualifications, it becomes a subject of some solicitude and apprehension. Lord Eldon wisely remarked, that instead of struggling by little circumstances to take cases out of a general rule, it is more wholesome to struggle not to let little circumstances prevent the application of the general rule. But this principle, in modern times, has been so poorly maintained, that the profession of the law, it seems to me is fast becoming a matter of memory rather than of reason and judgment ; and the study of it is already so much more the study of the exceptions and evasions of general principles, than of general principles themselves, that I am sometimes induced to think, that as a science, the law would be better understood, and as a rule of right, more justly administered, if the reports of judicial decisions for the last half century were struck out of existence. We see continually that the qualification or relaxation of a general principle, established by one reported case, is made the place of departure for ascertaining a new position in another, and this again in a third, and so on, until the original rule, the natural standard of the law, is obscured and utterly lost sight of, by means of intervening artificial

Wright *v.* Hart.

measures of supposed particular justice. The consequence to be feared is, that judicial reports, instead of being what no doubt it is intended they should be, beacons and land-marks to guide the public into quiet havens [460] of security and repose, may become false lights to decoy into the whirls and shoals of litigation. In speaking of the new and refined distinctions upon general principles, which in his day were multiplying, though in no degree as rapidly as since, Lord Mansfield remarked, that "if our rules are to be encumbered with all the exceptions which ingenious minds can imagine, there is no certain principle to direct us, and it were better to apply the principles of justice to every case and not to proceed to more fixed rules." And much more may we say, in looking at the ponderous volumes of reported cases which flood the country, and are multiplying with a rapidity that no diligence can keep pace with, that rather than that the science of the law should have to be sought in the exceptions, qualifications, and ingenious evasions of general rules, made and to be made by innumerable judges, the records of which are to be spread through thousands of volumes, it were better to abandon all attempts to preserve a written system of jurisprudence, and to revert at once to that species of administrative justice commended by Cicero, when "*Amissis auctoritatibus, ipsa re et ratione exquirere possumus veritatem.*"

In the earliest history of the common law, the distinction between its rules and those of the civil law in respect to the liability of vendors, was marked and acknowledged. More than two hundred years ago, Lord Coke, in speaking of it, says, "The civil law binds every man to warrant the thing he selleth, albeit there be no express warranty; but the common law bindeth him not, unless there be a warranty in deed or in law." And Popham, who, in the language of Chief Justice Eyre, was "a very able judge," says, (*Dyer,* 75,) "If I have an article which is defective, whether victuals or any thing else, and I, knowing it to be defective, sell it as sound, and so represent or affirm it, an action upon the case lies for the deceit; but although it be defective, if that is unknown to me, although I represent or affirm it to be sound, no action lies unless I warrant it to be sound."

Originally, the only implied warranty, or warranty in law, as distinguished from a warranty in fact, on the sale of personal property, was that [461] of ownership by the vendor. Afterwards, the sale of goods by sample was held to imply a warranty that the bulk of the goods corresponded in quality with the specimen exhibited; then, in case of goods not present at the sale, and consequently not susceptible of inspection by the buyer, a warranty was implied that they were of the general denomination or nature represented; then, though the goods were present and susceptible of inspection by the buyer, yet if not actually inspected, a warranty was implied that they were of the description and quality represented in the invoice or sale bill; this, however, is rather on the ground that the writing amounts to an express warranty in fact. Then, where goods are sold by the manufacturer of them, a warranty has been implied that they are of a merchantable quality; then, where goods are sold for a particular purpose, a warranty that they are fit for that purpose. Finally, in *Jones* v. *Bright,* (5 *Bing.* 533,) Chief Justice Best is disposed to consider the law as resolving itself into this: "that if a man sells generally, he undertakes [warrants] that the article is fit for some purpose, viz., that it is merchantable; and if he sells for a particular purpose, he undertakes [warrants] that it is fit for that particular purpose." Thus the English courts, in a circle of about two hundred years, by the process of finding a new principle in each departure from the old one, by extending each case a little beyond the rule of the case immediately preceding it, instead of measuring it by the original standard principle, have gradually but completely subverted the common law maxim of *caveat emptor,* and effectually, though perhaps undesignedly, substitued for it the repudiated principle of the civil law, which, as Lord Coke quaintly but correctly states it, "binds every man to warrant the

Wright v. Hart.

thing he selleth, albeit there be no express warranty." Some cases with us, and especially some propositions in the case of *Gallagher* v. *Waring*, (9 *Wendell*, 20,) would seem to indicate that our courts are upon the same pilgrimage; but the qualification of those propositions, in the opinion of the supreme court in the pre-[462] sent case, and especially the decisive and enlightened views expressed upon the whole subject, I am happy to say, afford satisfactory assurance that there is no disposition to adopt further changes, which, it is well re-marked, "would at best unsettle inveterate habits of business, and introduce a vast amount of litigation." In this connection I will add, in the words of a distin-guished jurist, "The common law affords to every one reasonable protection against fraud in dealings; but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indiffer-ence to the ordinary and accessible means of information."

For one, I am not disposed to go beyond what the courts of this state have heretofore gone, in furtherance of the doctrine of implied warranty; and indeed, I am constrained to think that in some instances, even they have allowed the hardship of the case to outweigh considerations of public policy, and in the pursuit of particular justice, have confused a little the certainty and simplicity of a rule, which, if firmly adhered to by courts, would soon come to be universally heeded by contracting parties. This remark certainly must be considered well founded, if the case of *Gallagher* v. *Waring* can be construed as sustaining either of the propositions advanced by Chief Justice Best, in the before cited case of *Jones* v. *Bright*. Not that I would contend that both those propositions may not be correct, if they had been restricted in their application to cases of the same nature as that in which they were advanced, which was *an action of fraud*, founded upon an executory sale. There the plaintiff applied to the defendant, a manufacturer, for the article; and the defendant, knowing the particular purpose for which the article was wanted, said, "I will supply you well." The action was on the case in the nature of deceit, and it was held that the plaintiff on the proof was entitled to recover damages. In this aspect of that case, the correctness of the de-cision of it need not be controverted; for I suppose it has never been doubted, that under a contract to sell goods of a particular description, if goods are delivered which do not answer the description, the contract is not fulfilled; and if they are latently defective, and therefore [463] received by the purchaser, and by him, ignorant of the defect, so disposed of, that he has not his remedy by a return of them, he may maintain an action against the seller for deceit, upon satisfactory proof that he practiced it. But it would be an anomaly if he could recover damages for a fraud, without some proof that it had been committed by the defendant. A case like this, how-ever, is very distinct in its nature from those of executed sales, where the article passes without any words, from the seller to the purchaser. In such a case, to imply a warranty of any thing whatever except title in the vendor, much more to imply a warranty that the article is merchantable; or if the purchaser happens to signify the purpose for which he wishes the article, to imply a war-ranty that it is fit for that particular purpose, is necessarily to subvert the common law principle, that the risk of the sale is with the purchaser, and to substitute for it the loose and litigious principle of the civil law, that the quality of the article must correspond with the price given for it. And here I will say, that if as a judge, I possessed, what no judge does possess, the power of determining which of the two rules should hereafter prevail in this state, I should not hesitate to prefer the rule of the common law, as exceedingly better fitted both for its cer-tainty and general justice, to the transactions of a commercial community, than that of the civil law. Indeed, one has only to run his eye over the refined dis-tinctions and subtle inventions to which the civilians have been obliged to resort, in order to give practical efficacy to their rule of *caveat venditor* in communities where the great principles of free trade are less understood and far less regarded

Wright *v.* Hart.

than in our own, to be convinced that its application to our extensive and com-
plicated traffic, if not absolutely impracticable, would at least be attended with
a great increase of litigation, and consequently with new embarrassments upon
trade.   In addition to this consideration, it may be remarked, that the broad dis
cretion, as well as the nice discrimination which the judicial administration of
such a rule must require, though not incompatible with the course of pro-
ceedings under the civil law organization of courts, would be very unsuited [464]
to the common law institution of trial by jury, and be productive of greater
confusion of right, and more frequent injustice in our courts, than in those organ-
ized under the civil law.   In short, I am satisfied with the rule of the common
law, notwithstanding the occasional hardships which, under it, as under all fixed
rules, may occur; and I am disposed to adhere to it closely not only because of
the solemn obligation upon us as judges to administer the law as we shall find it
to be, but also because I am firmly persuaded that it is the most honest and salu-
tary general rule that can be established on the subject.

In the present case, stress has been laid on the fact that the article sold was
flour, and it has been assumed and apparently conceded through the whole case,
that in the sale of provisions, or articles chiefly used for food, some different rule
as to an implied warranty exists, than has been clearly established in respect to
other articles of trade.   I am not aware that such a distinction is well founded,
either on principle or authority.   It is already seen, that in Popham's time the
rule was considered general, including " victuals," as much as other articles
and the expression, (3 *Black. Comm.* 166,) to the contrary, seems to be an
unsupported *dictum*, borrowed probably from the civil law, which has not since,
that I am aware of, been sustained by judicial decisions, and certainly has been
in some cases denied, particularly in *Emerson* v. *Brigham*, (10 *Mass. R.* 94.)
*Blackstone*, though a lucid and most agreeable commentator, and a writer to
whom the profession, especially in this country, is under the deepest obligations,
has, however, never been received by the English courts as very high au-
thority.   Lord Redesdale, (1 *Sch. & Lef.* 327,) said: " I am always sorry to
hear Mr. Justice Blackstone's commentaries cited as authority; he would have
been sorry himself to hear the book so cited; he did not consider it such."   The
case of *Van Bracklin* v. *Fonda*, (12 *Johns. R.* 468,) which has been supposed to
extend the doctrine of implied warranty to the sale of *provisions*, will not be
found, on examination, to support that position.   It was a decision upon a *cer-
tiorari* to a justice's court, and the action was *on the case*, in the nature of
deceit for selling the beef of a cow which the defendant knew to be diseas- [465]
ed.   The court, in giving its judgment, state the proof to have been that the
beef was unsound and unwholesome, and that the defendant knew that the animal
was diseased, and did not communicate the fact, and adds : " In the present case
the concealment that the animal was diseased is equivalent to the suggestion that
she was sound."   This decision, therefore, is within the general rule that each
party is bound, in every case, to communicate to the other his knowledge of
material facts, if he knows the other to be ignorant of them, and they be not open
and naked, or equally within the reach of his observation.   At any rate, the case
can in no way be regarded as extending the doctrine of implied warranty, the
action being founded upon fraud and not upon contract.   In the case now under
consideration, there is no evidence or even pretense of fraud.   The buyer and
the seller both had equal means of knowing, and equal knowledge of the article
sold.   The defect was latent, and of a character which, though it deteriorated
the quality, and consequently somewhat diminished the value of the article, did
not absolutely change its nature or render it utterly unfit for the ordinary pur-
poses for which it is used.   Nor can the proof be regarded as establishing what
every one knows to be otherwise, that the defect proved made the article unwhole-
some in the sense of endangering the public health.   The evidence, in this
respect, is to be construed with regard to the universal knowledge of the degree

of unwholesomeness that belongs to flour made of grown wheat. In short, the case presents nothing but what must be found in every case where there is neither express warranty, misrepresentation, nor concealment by the seller, and the article proves to be of a quality inferior to the expectation of the parties. And I know no principle upon which the plaintiff's right to recover damages can be maintained, short of the principle, which has never found place in the common law, that a sound price of itself imports the warranty of a sound article.

[466]      On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, and *Senators* J. BEARDS- LEY, BECKWITH, HUNTINGTON, J. P. JONES, LAWYER, LOOMIS, MAISON, SPRAKER—9.

*In the negative:* The CHANCELLOR, and *Senators* L. BEARDSLEY, DICKINSON, DOWNING, EDWARDS, JOHNSON, LACY, MCLEAN, MACK, PAIGE, POWERS, SEGER, TRACY, WAGER, WILLES—15.

Whereupon the judgment of the supreme court was AFFIRMED.